IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

HARPAL SINGH AHLUWALIA,

       Petitioner,              No. CIV S-08-CV-01391 GEB CHS P

    vs.

ROBERT AYERS, JR.,

       Respondent.         FINDINGS AND RECOMMENDATIONS

_____/

## I.  INTRODUCTION

Petitioner, Harpal Singh Ahluwalia, is a former state prisoner proceeding through counsel with a petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254.  Petitioner, who was released on parole on January 13, 2008, challenges the constitutionality of his 2003 convictions in the Superior Court of Sacramento County for soliciting Carlos Ramirez and David Leal to commit the murders of his estranged wife and her brother, in violation of CAL. PENAL § 653f(b).  Upon careful consideration of the record and applicable law, it is recommended that this petition for writ of *habeas corpus* relief be denied.

## II.  ISSUES PRESENTED

Petitioner sets forth five grounds for relief in his pending petition.  Specifically, Petitioner's claims are as follow:

(1)     His Fifth and Fourteenth Amendment Due Process rights were violated when his statement, unlawfully obtained through police coercion, was used against him at trial.

(2)     His Fifth and Fourteenth Amendment Due Process rights were violated when the trial court instructed the jury, pursuant to CALJIC 2.17.5, that his silence in the face of an accusation could be considered an adoptive admission and the prosecutor was subsequently permitted to argue in closing statements that the jury could infer Petitioner's guilt from his post-arrest, post-*Miranda* silence.

(3)     His Sixth Amendment right to confrontation was violated when cross examination of complaining witness Manjit Walia was curtailed.

(4)     His Sixth Amendment right to confrontation was violated when damaging hearsay evidence of an unknown origin was presented at trial through the testimony of Detective Patrick Keller.

(5)     He was denied his Sixth Amendment right to effective assistance of trial counsel due (a) to counsel's failure to conduct necessary pre-trial investigation into the drug and mental health problems of Carlos Ramirez, (b) to investigate and impeach Manjit Walia for lying under oath about the cause of his wife's death, (c) to present a defense, as well as (d) counsel's cumulative errors.

Petitioner's claims one and two are both allege due process violations, and will be in subsection (A). Subsection (B) examines Petitioners third and fourth claims regarding the alleged violations of his right to confrontation. Lastly, subsection (C) addresses the multiple ineffective assistance of counsel violations alleged with Petitioner's claim five.

## III.  FACTUAL BACKGROUND

The basic facts of Petitioner's crimes were summarized in the unpublished opinion[1] of the California Court of Appeals, Third Appellate District, as follows:

> Carlos Ramirez testified that at the time of the incident, he was a drug addict in need of money. Ramirez expressed his need of money to David Leal who informed him of a man who was willing to pay money for the murder of "a lady and his kids." On July 17, 2001,

---

[1]The appellate court's opinion in *People v. Ahluwalia*, No. C045210, was lodged in the record as Document 3 on September 23, 2009.

2

Ramirez informed the police that Leal was selling cocaine and that a man would pay to have someone burned alive.  After questioning, Ramirez agreed to participate in an undercover operation the next day.

Wearing a recording device, Ramirez met with Leal and defendant at Leal's auto body shop on July 18, 2001.  The parties conversed about cars, real estate, and then it turned to money and defendant's problems.  Defendant told Ramirez and Leal about people wanting to kill him, then requested Ramirez to "save my life."  When Ramirez asked how many people they were talking about, defendant responded that it was "just brother and sister."  Defendant further explained that the "woman is over here.  It's easy to do and man is in Redwood City.  Defendant said he could show Ramirez where the man lives.  Leal asked defendant if he wanted to get the sister too, and defendant responded, "[I]f you can, yeah, of course."  Defendant continued that "before she move, I wanted to, you know, fix it."  Defendant then offered to drive Ramirez to the location where the woman lived and where she took her kids to school.  When Ramirez asked, "Which one you want get first," defendant responded, "[D]o sister."  Defendant cautioned Ramirez that they are "very clever" and that "she clean the . . . secret bank files," but that "[s]he don't working now."  Defendant knew "what number she live" and he would "get the apartment key also."

Ramirez queried how much defendant was willing to pay.  After a discussion of the value of his car, defendant responded "two for five," then later, "three apiece."  Ramirez asked who would supply the guns and defendant responded, "That's your thing."  Defendant then agreed to take Ramirez to the victims' houses.  He said he would show Ramirez "her routes."

Defendant drove Ramirez down Florin Road to the apartment complex where defendant's wife resided.  Defendant told Ramirez it was apartment number 22.  Defendant then drove Ramirez to his children's school in Elk Grove.  Finally, the two went to Home Depot, where defendant had a duplicate key made, which he gave to Ramirez.  While defendant was inside Home Depot, a member of the surveillance team approached Ramirez and told him not to go with defendant to Redwood City, but to insist the two go back to Leal's body shop.

The next day, Ramirez returned to Leal's shop with Detective James Rodriguez, who was acting undercover as a man willing to commit a murder for money.  Defendant was not present during the meeting.  Ramirez, Leal, and Rodriguez discussed the details, including the location, weapons, and persons to murder.  Ramirez and Rodriguez left the body shop but returned later that evening.  Leal attempted to call defendant but was unable to reach him.  The parties continued to discuss their plan and continued to try to reach defendant.

Shortly before midnight on July 18, police arrived at the apartment of defendant's wife. The officers showed her a surveillance photograph of defendant taken at Leal's body shop. She identified the man in the photograph as defendant, whom she had left. Defendant's wife denied that her husband was physically abusive towards her, but told officers that her husband was mentally abusive. The officers asked her to relocate to a motel because they felt like her life was in danger. Though she resisted at first, she agreed to go to the motel with her two sons.

The next day, July 19, Detective John Keller visited defendant's wife at the motel. Detective Keller agreed to retrieve asthma medication from her apartment. As he was exiting the apartment, Detective Keller noticed a white car pull up, then quickly turn around and exit the parking lot. Approximately one mile down the road, the white car was stopped and defendant was identified as the driver. Defendant was wearing a large knife in a sling over his clothing and another knife in a sling under his clothing. Defendant also had $4,900 in hundred dollar bills on his person and a key that opened his wife's apartment.

Detective Keller did not read defendant his *Miranda* rights at the time he was taken into custody, which was just after 10:30 p.m. Defendant was read his *Miranda* rights at approximately 12:30 a.m., while in an interrogation room. Throughout the reading of his rights, defendant responded that he understood each right, but questioned Detective Keller as to why he had not been told these rights earlier. Detective Keller responded, "[J]ust because I hadn't gotten there yet." Thereafter, defendant spoke with Detective Keller at length regarding the alleged solicitation. Defendant's story was that Ramirez, for $5,000, would pray for and change the spirits of his wife and brother-in-law. Defendant believed, by "changing their spirits," both his wife and brother-in-law would like him again. A videotape of defendant's statements to Detective Keller was made.

A jury was given defendant's and Leal's videotaped statements and the transcripts, the surveillance videotapes and transcripts, and the wire cassette tapes and transcripts. Following deliberation, the jury found defendant guilty of soliciting the murder of his wife and brother-in-law.

(Lodged Doc. 3 at 3-5).

Petitioner was sentenced to a term of nine years imprisonment on the first count of solicitation, and a concurrent sentence of six years on the second count of solicitation. Petitioner timely appealed his convictions to the California Court of Appeal, Third Appellate District. The appellate court affirmed his convictions on July 5, 2005. Petitioner next sought review of his

4

1    convictions in the California Supreme Court. That petition was denied without comment on October

2    12, 2005. Petitioner then filed a petition for a writ of *certiorari* in the United States Supreme Court.

3    The Court denied review on February 27, 2006.

4            After exhausting the appellate process, Petitioner sought *habeas corpus* relief in the

5    Sacramento County Superior Court. On July 19, 2006, the court denied his petition in a reasoned

6    opinion. Petitioner subsequently filed that same *habeas corpus* petition in the California Court of

7    Appeal for the Third Appellate District and the California Supreme Court. Both petitions were

8    denied without comment.[2] Petitioner filed this federal petition for writ of *habeas corpus* on June

9    19, 2008. Respondent filed an answer on September 17, 2009, and Petitioner filed his traverse on

10   January 11, 2009.

11              **IV. APPLICABLE STANDARD OF HABEAS CORPUS REVIEW**

12           This case is governed by the provisions of the Antiterrorism and Effective Death

13   Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of *habeas corpus* filed after

14   its enactment on April 24, 1996. *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *Jeffries v. Wood*, 114

15   F.3d 1484, 1499 (9th Cir. 1997). Under AEDPA, an application for a writ of habeas corpus by a

16   person in custody under a judgment of a state court may be granted only for violations of the

17   Constitution or laws of the United States. 28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362,

18   375 n. 7 (2000). Federal *habeas corpus* relief is not available for any claim decided on the merits

19   in state court proceedings unless the state court's adjudication of the claim:

20           (1) resulted in a decision that was contrary to, or involved an
             unreasonable application of, clearly established federal law, as

21

22           [2] After the appellate court denied Petitioner's *habeas corpus* petition, but before the
     California Supreme Court issued its decision, Petitioner filed another petition for writ of *habeas*
23   *corpus* in the Sacramento County Superior Court on March 15, 2007. Noting the recently issued
     decision United States Supreme Court decision in *Cunningham v. California*, 549 U.S. 270 (2007),
24   Petitioner alleged that the aggravating factors upon which the trial judge had calculated his sentence
     had not been proved to a jury beyond a reasonable doubt. Accordingly, Petitioner was granted a new
25   sentencing hearing and was resentenced as noted above, and in compliance with *Cunningham*. The
     substance of this second state *habeas corpus* petition is irrelevant to Petitioner's current federal
26   *habeas corpus* petition.

                                                   5

1      determined by the Supreme Court of the United States; or

2      (2) resulted in a decision that was based on an unreasonable
       determination of the facts in light of the evidence presented in the
3      State court proceeding.

4    28 U.S.C. § 2254(d).  Although "AEDPA does not require a federal habeas court to adopt any one

5    methodology," *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003), there are certain principles which guide

6    its application.

7          First, AEDPA establishes a "highly deferential standard for evaluating state-court

8    rulings." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).  Accordingly, when determining whether

9    the law applied to a particular claim by a state court was contrary to or an unreasonable application

10   of "clearly established federal law," a federal court must review the last reasoned state court

11   decision. *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004); Avila v. Galaza, 297 F.3d 911,

12   918 (9th Cir. 2002).  Provided that the state court adjudicated petitioner's claims on the merits, its

13   decision is entitled to deference, no matter how brief. *Lockyer*, 538 U.S. at 76; *Downs v. Hoyt*, 232

14   F.3d 1031, 1035 (9th Cir. 2000).  Conversely, when it is clear that a state court has not reached the

15   merits of a petitioner's claim, or has denied the claim on procedural grounds, AEDPA's deferential

16   standard does not apply and a federal court must review the claim *de novo*. *Nulph v. Cook*, 333 F.3d

17   1052, 1056 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

18         Second, "AEDPA's, 'clearly established Federal law' requirement limits the area of

19   law on which a habeas court may rely to those constitutional principles enunciated in U.S. Supreme

20   Court decisions." *Robinson*, 360 F.3d at 155-56 (citing *Williams*, 529 U.S. at 381).  In other words,

21   "clearly established Federal law" will be " the governing legal principle or principles set forth by

22   [the U.S. Supreme] Court at the time a state court renders its decision." *Lockyer*, 538 U.S. at 64.

23   It is appropriate, however, to examine lower court decisions when determining what law has been

24   "clearly established" by the Supreme Court and the reasonableness of a particular application of that

25   law. *See Duhaime v. Ducharme*, 200 F.3d 597, 598 (9th Cir. 2000).

26         Third, the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have

6

"independent meanings." *Bell v. Cone*, 535 U.S. 685, 694 (2002).  Under the "contrary to" clause, a federal court may grant a writ of *habeas corpus* only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Williams*, 529 U.S. at 405.  It is not necessary for the state court to cite or even to be aware of the controlling federal authorities "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).  Moreover, a state court opinion need not contain "a formulary statement" of federal law, but the fair import of its conclusion must be consistent with federal law.  *Id*.

Under the "unreasonable application" clause, the court may grant relief "if the state court correctly identifies the governing legal principle...but unreasonably applies it to the facts of the particular case." *Bell*, 535 U.S. at 694.  As the Supreme Court has emphasized, a court may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 410.  Thus, the focus is on "whether the state court's application of clearly established federal law is *objectively* unreasonable." *Bell*, 535 U.S. at 694 (emphasis added).

Finally, the petitioner bears the burden of demonstrating that the state court's decision was either contrary to or an unreasonable application of federal law.  *Woodford*, 537 U.S. at 24 ; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

## V.  DISCUSSION

### A.  Due Process

#### 1.  Voluntariness of Petitioner's Post-Arrest Statement

Petitioner claims that his due process rights were violated when his unlawfully coerced statements were introduced against him at trial.  Petitioner notes that his claim does not allege a violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).  Rather, he challenges solely the voluntariness of the statements obtained from him during his interrogation at the police station

7

1  following his arrest.  Although Petitioner did not confess to the crimes of which he was accused, he

2  claims that the statements obtained from him during the interrogation were very damaging and

3  bolstered the prosecution's case against him.  Petitioner contends that the collective actions of

4  Detective John Keller, who interrogated Petitioner upon his arrest, were coercive, manipulative, and

5  misleading, thus undermining the voluntariness of his statements.

6        Respondent argues that Petitioner's claim is procedurally barred on the grounds that

7  he failed to object to the admission of his statements at trial.  In the alternative, Respondent argues

8  that Petitioner's claim must be denied on the merits because he spoke voluntarily with Detective

9  Keller, who made no promises or threats to Petitioner in order to induce his statements.  Moreover,

10  Respondent contends that the state appellate court's adjudication of Petitioner's claim on the merits

11  was neither contrary to nor a unreasonable application of clearly established federal law, nor was

12  it based on an unreasonable determination of the facts.

13        The United States Constitution mandates that confessions be made voluntarily.[3]  *See*

14  *Lego v. Twomey*, 404 U.S. 477, 483-85 (1972).  Involuntary confessions may not be used to convict

15  criminal defendants because they are inherently untrustworthy and because society shares "the deep-

16  rooted feeling that the police must obey the law while enforcing the law; that in the end life and

17  liberty can be as much endangered from illegal methods used to convict those thought to be

18  criminals as from the actual criminals themselves."  *Spano v. New York*, 360 U.S. 315, 320-21

19  (1959).  A confession is voluntary only if it is "'the product of a rational intellect and a free will.'"

20  *Medeiros v. Shimoda*, 889 F.2d 819, 823 (9th Cir. 1989) (quoting *Townsend v. Sain*, 372 U.S. 293,

21  307 (1963)).  *See also Blackburn v. Alabama*, 361 U.S. 199, 208 (1960).

22        The test for voluntariness, however, is not a simple question of whether a suspect's

23  statement was the product of his own free will.  Rather, "coercive police activity is a necessary

24  predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process

25

26       [3]Although Petitioner's statements were not a full confession, the analysis of their voluntariness remains the same.  *United States v. Orso*, 266 F.3d 1030, 1041 n.1 (9th Cir. 2001).

8

Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).  In other words, a statement is considered involuntary when the police obtained it "by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988).  Officials may not extract a confession "by any sort of threats or violence nor...by any direct or implied promises, however slight, nor by the exertion of any improper influence."  *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (internal quotations omitted).  In making the voluntariness determination, relevant factors to consider may include the youth of the accused, lack of education, low intelligence, lack of advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, or the use of physical punishment such as deprivation of food or sleep. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (internal citations omitted).  A confession must be suppressed when the totality of the circumstances demonstrate that the confession was involuntary.  *Dickerson v. United States*, 530 U.S. 428, 434 (2000).  *See also Winthrow v. Williams*, 507 U.S. 680, 711-712 (1993) (noting that a determination of voluntariness is on the totality of the circumstances).

The California Court of Appeal, Third Appellate District, considered and rejected Petitioner's involuntariness claim on the merits, explaining its reasoning as follows:

> Defendant claims his statements were involuntary because of the coercive environment of the interrogation and threats of incarceration and deportation.  Defendant further claims that at no time did he offer an unqualified waiver of his rights and he requested the assistance of counsel, which was denied in violation of his Sixth Amendment rights.
>
> Defendant failed to object during trial to admission of the statements on the grounds of involuntariness.  However, where the confession is as a matter of law involuntary, defendant's failure to object will not bar review.  (*In re Cameron* (1968) 68 Cal.2d 487, 503.)  While *Cameron* has been cited as questionable precedent, it has yet to be overruled by the Supreme Court.  (*People v. Kelly* (1992) 1 Cal.4th 495, 519 fn. 5.)  Therefore, we will consider whether the statement is involuntary as a matter of law.
>
> "[A]n involuntary confession or admission is inadmissible; a

9

statement is involuntary if it is the product of coercion or more generally, 'overreaching'; involuntariness requires coercive activity on the part of the state or its agents; and such activity must be, as it were, the 'proximate cause' of the statement in question, and not merely a cause in fact." (*People v. Mickey* (1991) 54 Cal.3d 612, 647.)

"'[I]n carrying out their interrogations the police must avoid threats of punishment for the suspect's failure to admit or confess particular facts and must avoid false promises of leniency as a reward for admission or confession . . . . [They] are authorized to interview suspects who have been advised of their rights, but they must conduct the interview without the undue pressure that amounts to coercion and without the dishonesty and trickery that amounts to false promise.'" (*People v. Holloway* (2004) 33 Cal.4th 96, 115, quoting *People v. Andersen* (1980) 101 Cal.App.3d 563, 576; *People v. Maestas* (1987) 194 Cal.App.3d 1499, 1506.)

Defendant argues that threats of incarceration, insinuation of deportation, and implied inducements of freedom all rendered his statements involuntary. He claims Detective Keller's threats are contained in the following excerpts:

"[Detective Keller]: But if you want an attorney, then I'm just gonna leave, and I'm gonna go do my business, and you're gonna go to County Jail. Okay? . . . [¶] . . .

"[Detective Keller]: Well, I don't want to say anymore if you don't want to talk. I'm gonna get up and go do my paperwork and go home. So it – it's up to you.

"[Defendant]: What's going to happen to me now?

"[Detective Keller]: Well, you're gonna go to jail."

Detective Keller then told defendant that he was going to leave the room and instructed defendant to knock on the door if defendant wished to speak. Defendant, in his opening brief, claims that he was then "abandoned, and held in isolation for nearly an hour until he surrendered to fatigue and knocked on the door." However, defendant does not support his allegation with any reference to the record. The record indicates defendant knocked on the door at some point and continued speaking with detective Keller.

Defendant claims threats of incarceration made his statement involuntary. However, the record does not reveal that Detective Keller threatened defendant with jail if he did not confess. The truth was that defendant would be going to jail because he had already been arrested for solicitation of murder. There is no evidence Detective Keller threatened defendant in a way that made defendant's statement involuntary. (See *People v. Spears* (1991) 228 Cal.App.3d

1, 27.)

As to defendant's claim of implied inducements of freedom, this record contains no such inducements.  There was no promise by the detective that defendant would return to his home.  At one point, defendant asked what happens next, Detective Keller responded, "[D]epends what all – what all is said."  This is not a promise to release defendant if he confesses.  There is nothing in the record to substantiate defendant's claim that his will was overcome with implied inducements of freedom.

As to the claim of threat of deportation, the following exchange occurred on the record:

"[Detective Keller]:  What happens with you and your deportation if you get arrested for another felony?

"[Defendant]:  Pardon?

"[Detective Keller]:  If you get arrested and put in jail for a felony –

"[Defendant]:  Yes.

"[Detective Keller]:   – what happens with your deportation and immigration stuff?

"[Defendant]:  So what I do?

"[Detective Keller]:   Can you be deported, or is that what will happen?

"[Defendant]:  Maybe."

This can hardly be characterized as a threat, and even if it were a threat, the consequences would flow naturally from the outcome of the criminal case.  Detective Keller did not trick defendant nor was he dishonest with defendant.  There is no indication of any false promises to defendant.  This line of questioning by Detective Keller could not have overcome the rational intellect and free will of defendant as a matter of law.  (See *People v. Flores* (1983) 144 Cal.App.3d 459, 468.)

Defendant also argues he did not voluntarily waive his *Miranda* rights and therefore his statements were improperly admitted.  However, this issue is barred because it was not properly preserved for appeal.  (*People v. Michaels* (2002) 28 Cal.4th 486, 511-512.)  There is no evidence in the record that defendant moved in limine or objected to the statements on the grounds of an involuntary *Miranda* waiver.  The only time that waiver was brought up was when the defense voir dired Detective Keller regarding whether defendant voluntarily waived his rights.  However, at no time did defendant

object to the statement on the grounds of an involuntary waiver. Therefore, we need not review the merits of this claim.

Defendant claims admission of his statement violated his Sixth Amendment right to counsel because while in custody he requested the assistance of counsel and was denied such assistance. Defendant's failure to raise the Sixth Amendment claim in the trial court waived the issue on appeal. (*People v. Watson* (1977) 75 Cal.App.3d 384, 394.) Moreover, defendant's statement, "I think I should talk to the attorney," is not an unequivocal request for an attorney and, therefore, the right to counsel was not implicated. (*Davis v. United States* (1994) 512 U.S. 452, 459 [129 L.Ed.2d 362, 371.)

(Lodged Doc. 3 at 8-12.)

Petitioner contends that the state appellate court improperly condoned Detective Keller's use of coercive interrogation techniques and that the court's reasoning is unsupported by the record. According to Petitioner, the totality of the circumstances surrounding his interrogation demonstrates that his statement was given involuntarily because "Detective Keller used psychological coercion and deceptive strategies, overcoming Petitioner's ability to exercise his right to remain silent." (Pet. at 10.) Petitioner claims that he, "an immigrant from India, was handcuffed at gunpoint and taken to the police station in the late evening where he was subjected to intensive interrogation in his fragmented second language." (Pet. at 7.) Petitioner claims he was threatened with "immediate incarceration and future deportation," that Detective Keller implied Petitioner would be released if he cooperated, and that "[n]o Miranda warnings were given until the interrogation was well under way and Petitioner was irrevocably committed to being interviewed." *Id*. Petitioner further alleges that Detective Keller refused to inform him of the basis for his arrest, deprived him of food, drink and sleep, and, when he attempted to invoke his right to counsel, he "was isolated in a room for approximately one hour in the middle of the night to 'think about it' until, deprived of sleep and refreshment, he agreed to continue the interview." *Id*. The totality of the circumstances, compounded by Petitioner's difficulty with the English language, confusion regarding his rights, and exhaustion, according to Petitioner, rendered his statement involuntary.

Petitioner overstates the circumstances revealed by the videotape and written

transcript of his interrogation by Detective Keller.  The court has reviewed both the videotape and written transcript of the interrogation, which took place  in the early morning hours of July 20, 2001 following Petitioner's arrest.  The videotape begins several minutes into the interrogation and ends after the interrogation has concluded.  The written transcript appears to reflect the complete interrogation from beginning to end.  Petitioner can be observed on the tape beginning at 12:27 a.m. until 3:11 a.m. when the tape ends.  Throughout the course of the interrogation, Petitioner shows no signs of drowsiness, pain or incoherence.[4]  Nor does Petitioner complain of any physical ailments. There is no indication that he is under the influence of a substance, and in fact, he informed the detective that he does not drink alcohol.  (Lodged Doc. 10 at 536.)  Petitioner was supplied with several bottles of drinking water throughout the course of the interrogation.  Indeed, he has a bottle of water in front of him at 12:27 a.m. when the tape of the interrogation begins and can be observed drinking from it periodically.  At 1:07 a.m. Petitioner requested another bottle of water and to use the restroom.  His requests were complied with immediately.  He and the detective left the room to use the restroom and, upon their return, another bottle of water was given to Petitioner at 1:13 a.m. A third bottle of water was given to Petitioner at 2:40 a.m.  Petitioner did not request any food throughout the course of the interview.

Petitioner does not assert, and the record does not reflect, that his age, education or intelligence made him susceptible to coercion.  *Schneckloth*, 412 U.S. at 226.  To the contrary, the record reflects that Petitioner was forty-seven years old at the time of the interrogation and was college educated in both India and the United States.  To the extent that Petitioner claims the voluntariness of his statement is undermined by his limited English language skills, this claim is also unsupported by the record.  Although Petitioner clearly speaks with an accent and at times can be difficult to understand, he displays no difficulty understanding the questions asked of him, and in

---

[4] Part way through the interrogation, Petitioner was left alone in the interrogation room for a duration of approximately fifty-four minutes.  During this period of time, Petitioner appeared to be bored and napping.  However, at no point during the actual interrogation itself did Petitioner exhibit these signs.

fact, responds to questions in a normal and appropriate manner.  Indeed, Petitioner's claim is further weakened because he confirmed during the interrogation that he could read English, and also revealed that he had worked as a Punjabi interpreter for an immigration attorney in San Francisco, California.  (Lodged Doc. 10 at 533, 537).

Although Petitioner does not expressly make a *Miranda* claim in the pending petition, he does claim that Detective Keller failed to inform him of his rights under *Miranda* "until the interrogation was well under way and Petitioner was irrevocably committed to being interviewed," and then ignored Petitioner's repeated requests for counsel, thus demonstrating that the detective's actions were manipulative, misleading and coercive.  However, not all police questions implicate *Miranda*; only statements resulting from custodial police interrogation fall within its scope.  *Rhode Island v. Innis*, 446 U.S. 291, 299-300 (1980).  "[I]nterrogation means questioning or 'its functional equivalent,' including 'words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *Pope v. Zenon*, 69 F.3d 1018, 1023 (9th Cir. 1995) (quoting *Innis*, 446 U.S. at 301).  In contrast, questions or statements that are "normally attendant to arrest and custody" do not constitute interrogation.  *Pennsylvania v. Muniz*, 496 U.S. 582, 600-02 (1990).

*Miranda* warnings are required prior to a custodial interrogation.  *Miranda v. Arizona*, 384 U.S. 436 (1966).  If an accused is not advised of his rights prior to an interrogation, any statements he makes, whether inculpatory or exculpatory, may be excluded from evidence.  *Id.* at 444.  Once an accused has been properly advised of his rights, he may make a knowing, intelligent, and voluntary waiver of them.  *Id.* at 475.  A valid waiver depends on the totality of the circumstances, including the background, experience, and conduct of the defendant.  *See United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir. 1986).

In Petitioner's case, prior to reaching any substantive questioning, Detective Keller spent approximately twenty minutes obtaining background information from Petitioner.  This information included Petitioner's address, phone number, business address, business phone number,

cell phone number, social security number, his country of origin, how long he had been living in the United States, where he had lived in the United States, how long he had lived in Sacramento, whether he had relatives in the Sacramento area, his level of education, his native language, whether he had any medical problems, whether he had ever been in trouble with the police or had been arrested in the United States, whether he was on probation, and whether he had been drinking that evening. (Lodged Doc. 10 at 521-537.) The state appellate court properly found that this line of questioning did not implicate Petitioner's *Miranda* rights. On this record, it cannot be said that Detective Keller's questions prior to informing Petitioner of his *Miranda* rights were "reasonably likely to elicit an incriminating response from the suspect." *Pope v. Zenon*, 69 F.3d at1023. Moreover, that Petitioner *sua sponte* disclosed what he believes to be incriminating information during the first twenty minutes he spoke to Detective Keller is of no consequence. "[T]he police surely cannot be held accountable for the unforeseeable results of their words or actions...." *Innis*, 446 U.S. at 302.

After collecting the above discussed background information, Detective Keller then told Petitioner that he needed to inform him of his *Miranda* rights, confirmed that Petitioner could read English, and handed Petitioner a card containing a written version of the rights. Detective Keller then advised Petitioner of his *Miranda* rights orally, and Petitioner followed along by reading the card:

| DET. KELLER: | - - but if you'll - - could you read English? |
|---|---|
| [PETITIONER]: | Yes. |
| DET. KELLER: | Why don't you read it while I say it out loud. Okay? You have the right to remain silent. |
| [PETITIONER]: | Okay. |
| DET. KELLER: | You understand that? |
| [PETITIONER]: | Okay. |
| DET. KELLER: | Do you understand that? |

1     [PETITIONER]:     Yes.

2     DET. KELLER:     Anything you say may be used against you in
court.

3

4     [PETITIONER]:     Okay.

    DET. KELLER:     Do you understand that?

5

6     [PETITIONER]:     You have the right to the presence of an
attorney before and during any questioning.
Do you understand that?

7

8     [PETITIONER]:     Yes.

    DET KELLER:     If you cannot afford an attorney, one will be
appointed for you free of charge before any
questioning if you want.

9

10

11     [PETITIONER]:     Okay.

12     DET. KELLER:     Do you understand that?

13     [PETITIONER]:     Yes, sir.

14     DET. KELLER:     Okay.  So you understand that you have the
right not to talk to me?

15     [PETITIONER]:     Okay.

16     DET. KELLER:     And that you have the right - -

17     [PETITIONER]:     Why you did [sic] not told me before?

18     DET. KELLER:     Huh?

19     [PETITIONER]:     Why you did [sic] not told me before?

20     DET. KELLER:     Well, just because I hadn't gotten there yet.

21     [PETITIONER]:     Okay.

22     DET. KELLER:     - - um - - and you also have the right to an
attorney.  Okay?

23

24     [PETITIONER]:     Uh-huh.

    DET. KELLER:     There's a lot of things bein' [sic] said that I
would like to talk to you about.

25

26     [PETITIONER]:     Tell me.

16

| | | |
|---|---|---|
| 1 | DET. KELLER: | Okay?  So will you talk to me? |
| 2 | [PETITIONER]: | Can't you tell me first what is the things, sir? |
| 3 | DET. KELLER: | Well, there's some accusations being made against you.  Okay? |
| 4 | [PETITIONER]: | By who? |
| 5 | DET. KELLER: | Well, we'll - - we'll get into that, but I can't - - I don't want to talk about it if you don't want to talk about it. |
| 6 | | |
| 7 | [PETITIONER] | Well, if you tell me, I should have idea [sic] because I don't know anything.  So if you tell me there is something, then I should know it.  Can you give me some idea? |
| 8 | | |
| 9 | | |
| 10 | DET. KELLER: | You lost me on what you said.  Do you - - do you want to talk to me about what's goin' [sic] on? |
| 11 | | |
| 12 | [PETITIONER]: | I - - I wanted to - - to hear from you that what's [sic] happening. |
| 13 | DET. KELLER: | Okay. |
| 14 | [PETITIONER]: | I wanted to know it. |
| 15 | DET. KELLER: | Well, there's some - - some people sayin' [sic] that you're involved with some things.  Okay? |
| 16 | | |
| 17 | [PETITIONER]: | I'm involved in (Inaudible)? |
| 18 | DET. KELLER: | Yep.  And I don't know if it's true or not.  Okay?  I would like to talk to you about that, but if you don't want to talk to me back, then that's fine. |
| 19 | | |
| 20 | [PETITIONER]: | I - - I wanted to hear it. |
| 21 | DET. KELLER: | Okay.  I don't want to be the only one talkin' [sic] is what I'm tellin' [sic] you.  So if you want to talk back and forth to me - - |
| 22 | | |
| 23 | [PETITIONER]: | Okay. |
| 24 | DET. KELLER: | - - that's fine. |
| 25 | [PETITIONER]: | Okay. |
| 26 | | |

17

| 1 | DET. KELLER: | Okay?  Is that what you'd like to do then? |
| 2 | [PETITIONER]: | Yeah.  I wanted to hear it. |
| 3 | DET. KELLER: | And try and figure this - - |
| 4 | [PETITIONER]: | Yes. |
| 5 | DET. KELLER: | - - all out? |
| 6 | [PETITIONER]: | Yes. |

(Lodged Doc. 10 at 537-540.)

Contrary to Petitioner's contention, he was not "irrevocably committed to being interviewed" at this point.  The above exchange demonstrates that Petitioner was adequately informed of his *Miranda* rights, acknowledged that he understood them, and nonetheless decided to speak with Detective Keller.  The record does not support Petitioner's assertion that his statement was involuntary because he never offered an unqualified waiver of his rights.  A waiver of *Miranda* rights need not be express.  *Butler*, 441 U.S. at 373.  Indeed, a waiver can be implied so long as the totality of the circumstances indicates that the waiver was knowing and voluntary.  *Id*.  The record likewise does not support Petitioner's allegation that he was confused regarding his rights or that Detective Keller's actions "prevented Petitioner from exercising judgment that was the product of a reasoned and informed choice and of his own free will."  (Pet. at 12 (internal citations omitted).)  Petitioner's indication that he understood his rights and that he wished to speak with Detective Keller is sufficient to demonstrate that his waiver was valid.  *See Paulino v. Castro*, 371 F.3d 1083, 1086-87 (9th Cir. 2004) (statement that suspect understood his rights and wished to speak to officer constituted a sufficient waiver).

Petitioner next claims that midway through the interrogation he attempted to invoke his right to counsel.  According to Petitioner, Detective Keller responded by again engaging in coercive behavior,  isolating Petitioner in the interrogation room, refusing him food and water, and depriving him of sleep for an excruciating period of time until he succumbed to exhaustion and "without being informed of any alternatives, Petitioner knocked [on the door of the interrogation

room] and questioning continued."   (Pet. at 11.)   A review of the record reflects that at

approximately 1:39 a.m., after being questioned for approximately an hour and twenty minutes,

Petitioner stated "I think I should talk to an attorney."   Detective Keller responded as follows:

| | |
|---|---|
| DET. KELLER: | Okay.  Harpal, I would like to talk to you about what David was talking to you about. |
| [PETITIONER]: | Okay. |
| DET. KELLER: | Okay?  Cuz [sic] it sounds like he's asking you some different things about money, and jewelry, and things like that. |
| [PETITIONER]: | He was.  Okay. |
| DET. KELLER: | But if you want an attorney, then I'm just gonna leave, and I'm gonna go do my business, and you're gonna go to County Jail. Okay? |
| [PETITIONER]: | Okay. |
| DET. KELLER: | But if you want to talk to me, I would like to stay in here and talk to you. |
| [PETITIONER]: | Then what (Unintelligible) happen? |
| DET. KELLER: | Depends what all - - what all is said. |

(Lodged Doc. 10 at 596-970.)  Petitioner made several more statements to Detective Keller, who

then attempted to clarify whether Petitioner was, in fact, invoking his right to counsel.  Detective

Keller explained that if Petitioner did not wish to continue the interrogation, the detective would

complete his paperwork and go home, and Petitioner would go to jail.  Petitioner then solicited

Detective Keller for advice regarding whether it would be better for him to talk to the detective or

to obtain an attorney.  Detective Keller responded that Petitioner was a "grown man" and that he

needed to "make [his] own decisions." (Lodged Doc. 10 at 599.)  Detective Keller then indicated

that he was going to leave the room to use the restroom, and that Petitioner should knock on the door

if he wished to talk some more.  Petitioner responded, "I am willing to talk.  I'm just telling you,

though, that they are just setting me..." (Lodged Doc. 10 at 601.)  Petitioner continued to insist that

1   he had already told the detective the truth.   At 1:44 a.m., Detective Keller left Petitioner in the

2   interrogation room, again informing him that he should knock on the door if he wanted to talk.

3            The United States Supreme Court has made clear that in order to invoke the right to

4   counsel, a suspect must make an *unambiguous* request for an attorney, articulating his desire

5   sufficiently clearly that a reasonable police officer under the circumstances would understand the

6   statement to be a request for an attorney. *Davis v. United States*, 512 U.S. 452, 459 (1994).   Officers

7   are not required to clarify an ambiguous statement.   *Id*. at 461-62.   An accused who expresses a

8   desire to have counsel present during custodial interrogation is not subject to further interrogation

9   by the authorities until counsel is made available to him unless the accused himself "initiates further

10   communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477,

11   484-85 (1981).

12            Here, Petitioner was required to clearly request an attorney in order to invoke his

13   right to counsel and prevent further police interrogation. *Davis*, 512 U.S. at 459.   The United States

14   Supreme Court has held that the statement "Maybe I should talk to a lawyer" was not an

15   unambiguous request for counsel. *Davis*, 512 U.S. at 459-62.   Likewise, when a "suspect's request

16   for counsel is qualified with words such as 'maybe' or 'might,' [the Ninth Circuit has] concluded

17   that the suspect did not unambiguously invoke his right to counsel." *Arnold v. Runnels*, 421 F.3d

18   859 (9th Cir. 2005).   Thus, in *United States v. Younger*, 398 F.3d 1179, 1187 (9th Cir. 2005), the

19   statement "but, excuse me, if I am right, I can have a lawyer present through all of this, right?" was

20   not considered an unambiguous request for counsel.   Similarly, in *Clark v. Murphy*, 331 F.3d 1062,

21   1069-72 (9th Cir. 2003), a suspect's statement that  "I think I would like to talk to a lawyer" did not

22   constitute an unambiguous request for counsel.   In this case, Petitioner's statement that  "I think I

23   should talk to an attorney," is a hybrid of the statements at issue in *Davis* and *Clark*.   Those

24   statements were considered to be insufficient to trigger a suspect's right to counsel, and there is no

25   material difference between the statements at issue in those cases and Petitioner's statement here.

26   Moreover, when Detective Keller attempted to clarify whether Petitioner was, in fact, invoking his

20

right to counsel, Petitioner clearly responded "I am willing to talk to you."

Petitioner was left alone in the interrogation room from 1:44 a.m. until he got up and knocked on the door at 2:38 a.m and requested to again speak with Detective Keller.  While alone in the interrogation room, Petitioner appears to be bored and napping.  Upon Detective Keller's return to the interrogation room, he informed Petitioner that he had been wrapping up paperwork.  Before resuming the interrogation, Detective Keller again clarified whether Petitioner wished to invoke his right to counsel.  The following exchange occurred:

| | |
|---|---|
| DET. KELLER: | Do you want to talk to me now, or do you want an attorney? |
| [PETITIONER]: | I don't mind.  I have already talked to you. |
| DET. KELLER: | Yeah, you have. |
| [PETITIONER]: | If I have something in my mind, then why I talk (Unintelligible) because nothing - - |
| DET. KELLER: | Just tell me yes or no, do you want an attorney? |
| [PETITIONER]: | I - - I can talk to you. |

(Lodged Doc. 10 at 601.)  Thus, even assuming *arguendo* that Petitioner properly invoked his right to counsel previously, it was Petitioner who reinitiated contact with Detective Keller and requested to resume speaking with him.  *See Edwards,* 451 U.S. at 484-85.  Prior to resuming substantive interrogation questions, Detective Keller ensured that Petitioner was not invoking his right to counsel and that he wished to speak with the detective.  On this record, it cannot be said that Detective Keller ignored an unambiguous request by Petitioner for counsel.

Petitioner next claims that Detective Keller coerced him to succumb to the interrogation with threats and implied promises.  Officials cannot extract a confession "by any sort of threats or violence, nor . . . by any direct or implied promises, however slight, nor by the exertion of any improper influence."  *Hutto*, 429 U.S. at 38 (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)).  The breadth of this rule is circumscribed by the requirement that "[t]he promise must be sufficiently compelling to overbear the suspect's will in light of all attendant

circumstances." *Leon Guerrero*, 847 F.2d at 1366 (internal citations omitted).  According to Petitioner, Detective Keller impliedly promised his release was possible that evening "[d]epend[ing] on what all - - what all is said." Lodged Doc. 10 at 597.  As properly noted by the state appellate court, this statement cannot be characterized as a promise to release Petitioner if he confessed. Moreover, the record reveals that later on in the interrogation, Detective Keller expressly refused to make any promises to Petitioner regarding what would happen to him if he were to continuing speaking with the detective.  The following exchange took place:

> [PETITIONER]:      Okay.  So tell me if I tell you the truth, what will you do?  You will leave me tonight if I tell you the truth?[5]
>
> DET. KELLER:       You know, Paul, I don't know what's gonna [sic] occur.
>
> [PETITIONER]:      Just promise me.  Tell me what I do.
>
> DET. KELLER:       What I can promise you is that if you tell me the truth, I will write down the truth and that will be in the police report.
>
> [PETITIONER]:      Okay.
>
> DET. KELLER:       If you tell me lies - -
>
> [PETITIONER]:      Okay.
>
> DET. KELLER:       - - okay?
>
> [PETITIONER]:      Okay.
>
> DET. KELLER:       Like you did earlier, that's gonna be down in the police report.

(Lodged Doc. 10 at 602).  Petitioner's claim that Detective Keller implied promised Petitioner that he had a possibility of being released following the interrogation is thus without merit.

The record also does not support Petitioner's claim that his statement was coerced

---

[5] The transcript of the interrogation reflects that part of this statement was inaudible to the court reporter.  The court's review of the interrogation tape reflects Petitioner's full statement to be as set forth herein.

by Detective Keller's failure to inform him of the reasons for his arrest or that the detective threatened him that he would be deported or that he "was gonna go to County Jail" if he did not continue the interrogation. (Lodged Doc. 10 at 597.) Although Detective Keller did not initially discuss the specific allegations against Petitioner, he did eventually explicitly inform him that he was accused of soliciting the murder of his wife and brother-in-law. ( *See* Lodged Doc. 10 at 620-629.) Detective Keller did not deceive Petitioner regarding the reasons for his arrest, nor did he misrepresent the allegations in any way. However, even if he had, this would not necessarily evidence coercive conduct on the part of the detective. *See Haswood*, 350 F.3d at 1024 (citing *Pollard v. Galaza*, 290 F.3d 1030, 1034 (9th Cir. 2002). Further, the record does not support Petitioner's allegation that Detective Keller threatened him with deportation in order to coerce him to speak with the detective. To the contrary, Detective Keller merely inquired as to whether Petitioner would suffer immigration consequences as a result of being arrested for another felony as follows:

| | |
|---|---|
| DET. KELLER: | What happens with you and your deportation if you get arrested for another felony? |
| [PETITIONER]: | Pardon? |
| DET. KELLER: | If you get arrested and put in jail for a felony - - |
| [PETITIONER]: | Yes. |
| DET. KELLER: | - - what happens with your deportation and immigration stuff? |
| [PETITIONER]: | So what I do? |
| DET. KELLER: | Can you be deported, or is that what will happen? |
| [PETITIONER]: | Maybe . . . . |

(Lodged Doc. 10 at 631.) The state appellate court properly determined that Detective Keller's statements cannot be characterized as threats.. Nor does the record does not reflect that the detective threatened Petitioner with jail if he did not confess. To the contrary, Detective Keller informed

1    Petitioner on several occasions that he would be taken to jail at the conclusion of the interview.  As

2    the state appellate court noted, "[t]he truth was that defendant would be going to jail because he had

3    already been arrested for solicitation of murder."  (Lodged Doc. 3 at 10.)  Reciting potential

4    penalties or sentences, including the potential penalties for lying to the interviewer does not

5    constitute coercion.  *United States v. Haswood*, 350 F.3d 1024, 1029 (9th Cir. 2003) (citing *United*

6    *States v. Orso*, 266 F.3d 1030, 1039 (9th Cir. 2001)).  Petitioner's contention that it was subjectively

7    unclear to him that he would be going to jail that evening as a result of his arrest does not change

8    this analysis because a suspect's mental state, absent coercive police conduct, does not render a

9    statement involuntary.  *See Frazier v. Cupp*, 394 U.S. 731, 739 (1969); *United States v. Turner*, 926

10   F.2d 883, 888 (9th Cir. 1991) (citing *Connelly*, 479 U.S. at 169-71).

11           Lastly, Petitioner's claim that Detective Keller acted coercively by depriving

12   Petitioner of food, drink, and sleep is without merit.  As noted above, Petitioner can be observed on

13   the videotape of the interrogation drinking three separate bottles of water throughout the course of

14   the questioning.  Moreover, when Petitioner requested another bottle of water and to use the

15   restroom, his requests were complied with almost immediately.  Petitioner did not ask for any food,

16   and there was no indication during the interrogation that he was drowsy or sleep deprived, and the

17   interrogation lasted for just under three hours.  These circumstances do not lead to an inference that

18   Petitioner's will was overborne such that his statement was rendered involuntary.  *See, e.g.,*

19   *Cunningham v. Perez*, 345 F.3d 802, 810-11 (9th Cir. 2003) (plaintiff's free will was not undermined

20   where interrogation lasted for eight hours and plaintiff was given a break for food and water); *Clark*

21   *v. Murphy*, 331 F.3d 1062, 1073 (9th Cir. 2003) (state court reasonably determined that interrogation

22   was not coercive where suspect was interrogated over a five hour period in a six by eight foot room

23   without water or a toilet).

24           Detective Keller's conduct and statements as set forth above do not fall within the

25   realm of coercive police conduct established by existing Supreme Court precedent.  *C.f. Mincey v.*

26   *Arizona*, 437 U.S. 385 (1978) (defendant subjected to a four hour interrogation while incapacitated

1   and sedated in intensive-care unit); *Greenwald v. Wisconsin*, 390 U.S. 519 (1968) (defendant on

2   medication interrogated for over 18 hours without food or sleep); *Beecher v. Alabama*, 389 U.S. 35

3   (1967) (police officers held gun to the head of a wounded suspect to extract a confession); *Davis v.*

4   *North Carolina*, 384 U.S. 737 (1966) (16 days of interrogation in closed cell without windows and

5   with limited food); *Reck v. Pate*, 367 U.S. 433 (1961) (defendant held for four days with inadequate

6   food and medical attention until confession obtained); *Culombe v. Connecticut*, 367 U.S. 568 (1961)

7   (defendant held for five days of repeated questioning during which police employed coercive

8   tactics). *See also Connelly*, 479 U.S. at 164 (noting that all United States Supreme Court decisions

9   finding a confession to be involuntary "have contained a *substantial element* of coercive police

10  conduct") (emphasis added).  On the record in this case, it cannot be said that Petitioner's rational

11  intellect and free will was overborne by Detective Keller's allegedly coercive conduct such that

12  Petitioner's statement was rendered involuntary.  The California Court of Appeals determination that

13  Petitioner's involuntariness claim was without merit is thus not contrary to or an unreasonable

14  application of clearly established federal law.  Petitioner is not entitled to federal *habeas corpus*

15  relief on this claim.

16  **2. Adoptive Admission**

17          Petitioner claims that the trial court committed constitutional error under *Doyle v.*

18  *Ohio*, 426 U.S. 610 (1976) by instructing the jury with respect to adoptive admissions, pursuant to

19  CALJIC 2.71.5, as follows:

20          If you should find from the evidence that there was an occasion when
        the defendant  (1) under conditions which reasonably afforded him
21      an opportunity to reply; (2) failed to make a denial or made false,
        evasive or contradictory statements, in the face of an accusation,
22      expressed directly to him or in his presence, charging him with the
        crime for which this defendant now is on trial or tending to connect
23      him with its commission; and (3) that he heard the accusation and
        understood its nature, then the circumstance of his silence and
24      conduct on that occasion may be considered against him as indicating
        an admission that the accusation thus made was true.  Evidence of an
25      accusatory statement is not received for the purpose of proving its
        truth, but only as it supplies meaning to the silence and/or conduct of
26      the accused in the face of it.  Unless you find that the defendant's

25

1
2

silence and/or conduct at the time indicated an admission that the accusatory statement was true, you must entirely disregard the statement.

3   (Lodged Doc. 10 at 358). Petitioner contends that in so instructing the jury, the trial court permitted

4   evidence of Petitioner's exercise of his *Miranda* right to silence in response to accusatory statements

5   made by Detective Keller during his post arrest custodial interview to be used against him, thus

6   violating his due process rights under *Doyle*. The California Court of Appeal, Third Appellate

7   District, considered and rejected Petitioner's claim on the merits, explaining its reasoning as follows:

8
9
10
11
12
13
14
15

Defendant claims the trial court erred when it instructed the jury regarding "Adoptive Admission - - Silence, False or Evasive Reply to Accusation." (CALJIC No. 2.71.5.) When a defendant, under conditions to which reasonably afford him an opportunity to reply, fails to deny an accusation or makes false, evasive or contradictory statements, the silence may be treated as an admission that the accusation was true. (CALJIC No. 2.71.5.) Defendant argues that an adoptive admission instruction violates his constitutionally protected right to remain silent. Defendant argues the only evidence that could have been subject to CALJIC No. 2.71.5 was his interview with Detective Keller, after *Miranda* warnings had been given. Relying on *People v. Edmonson* (1976) 62 Cal.App.3d 677, defendant argues that where a person relies on the Fifth Amendment right to remain silent, silence cannot be used against that person as an adoptive admission of guilt.

16
17
18
19
20

Here, defendant did not invoke his right to remain silent. He voluntarily waived his right to remain silent and spoke with Detective Keller. Defendant was never actually silent; he continued to talk and continued to respond falsely to accusations by Detective Keller. Because defendant voluntarily waived his right to silence and did not remain silent, he cannot now claim prejudice in an instruction that stated, in part, that the jury could use silence as an adoptive admission.

21   (Lodged Doc. 3 at 12-13.)

22   Federal *habeas corpus* relief is unavailable for alleged error in the interpretation or

23   application of state law. *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985); *Givens v.*

24   *Housewright*, 786 F.2d 1378, 1381 (9th Cir. 1986). A challenge to a jury instruction, therefore,

25   generally does not state a federal constitutional claim. *See Middleton*, 768 F.2d at 1085 (citing

26   *Engle v. Isaac*, 456 U.S. 107, 119 (1982)). In order to warrant federal *habeas corpus* relief the jury

1   instruction in question "cannot be merely 'undesirable, erroneous, or even 'universally condemned,''

2   but must violate some due process right guaranteed by the fourteenth amendment." *Prantil v.*

3   *California*, 843 F.2d 314, 317 (9th Cir. 1988) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146

4   (1973)).

5            Thus, in order to prevail on a *habeas corpus* claim alleging that a jury instruction was

6   given in error, a petitioner bears the burden of demonstrating that the erroneous charge "'so infected

7   the entire trial that the resulting conviction violates due process.'" *Estelle v. McGuire,* 502 U.S. 62,

8   72 (1991) (quoting *Cupp*, 414 U.S. at 147).   A court must evaluate the challenged jury instruction

9   "'in the context of the overall charge to the jury as a component of the entire trial process.'" *Prantil*,

10  843 F.2d at 817 (quoting *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th Cir. 1984).   Even if an error

11  of constitutional magnitude is demonstrated, a petitioner must also establish prejudice.   The analysis

12  for determining whether a trial is "so infected with unfairness" as to rise to the level of a due process

13  violation is similar to the analysis used in determining whether, under *Brecht v. Abrahamson*, 507

14  U.S. 619, 623 (1993), an error had a "substantial and injurious effect" on the outcome.   *See*

15  *Sarausad v. Porter*, 479 F.3d 671, 692 (9th Cir. 2007); *Leavitt v. Arave*, 383 F.3d 809, 834 (9th Cir.

16  2004).

17           The United States Supreme Court has clearly stated that "the use for impeachment

18  purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings,

19  violate[s] the Due Process Clause of the Fourteenth Amendment." *Doyle*, 426 U.S. at 610.   In

20  addition, the Fifth Amendment, as applied to the states by the Fourteenth Amendment, "forbids

21  either comment by the prosecution on the accused's silence or instructions by the court that such

22  silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609 (1965).   These rules rest "on the

23  fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him

24  and then using his silence to impeach an explanation subsequently offered at trial." *Wainwright v.*

25  *Greenfield*, 474 U.S. 284, 291 (1986) (internal citations omitted).   A violation of these rules occurs

26  when the prosecution makes use of a criminal defendant's post arrest silence and the trial court

1    permits that use.  *Greer v. Miller*, 483 U.S. 756, 764 (1987).  Therefore, Petitioner must demonstrate

2    the that prosecution, in fact, utilized his post arrest silence in some way.

3            In this case, it is not reasonable to assume that the jury would have applied the

4    adoptive admission instruction to any post-arrest silence because there was no post arrest silence.

5    As set forth in the above subsection, Petitioner submitted to a videotaped interview with Detective

6    Keller following his arrest.  Prior to any questioning "reasonably likely to elicit an incriminating

7    response,"*Pope*, 69 F.3d at 1023 (quoting *Innis*, 446 U.S. at 301), Petitioner was informed of his

8    *Miranda* rights and voluntarily chose to waive them and speak with the detective.  Petitioner claims

9    that he did not expressly waive his rights under *Miranda*, however as previously discussed, a waiver

10   of *Miranda* rights need not be express.  *Butler*, 441 U.S. at 373.  An accused who has voluntarily

11   waived his rights, however, may reinvoke them after a custodial interrogation has begun.  Recent

12   United States Supreme Court jurisprudence requires that, much like invocation of the right to

13   counsel, an accused who wishes to invoke his right to remain silent must do so unambiguously.

14   *Berghuis v. Thompskins*, 130 S.Ct. 2250, 2260 (2010) (adopting the *Davis* requirement that

15   invocation of counsel must be unambiguous in the context of invoking the right to remain silent).

16           Petitioner has not directed the court to any specific point in the record in which he

17   unambiguously invoked his right to remain silent, and the court's own review of both the videotape

18   and transcript of Petitioner's interview reveals no such invocation.  Petitioner spoke continuously

19   with Detective Keller throughout the course of the interview, absent the period of time the detective

20   left the room to use the restroom and complete paperwork.  In fact, at times  Detective Keller had

21   to ask Petitioner to stop speaking so that the detective could repeat Petitioner's statements back to

22   him to ensure he understood Petitioner's explanations.  Nor was Petitioner silent in the face of

23   Detective Keller's accusations. To the contrary, when Detective Keller accused Petitioner of murder

24   for hire, the videotape reflects Petitioner shaking his head adamantly, verbally denying the

25   accusations repeatedly, and offering alternative explanations of the facts.  Petitioner continued to

26   answer questions and to respond to Detective Keller's accusations until the detective left the room

and the interview was concluded.  On this record, there is no post arrest silence from which to draw

an adverse inference.

In addition, Petitioner has failed to demonstrate that the prosecutor improperly argued

to the jury that Petitioner's post-arrest silence was evidence of his guilt.  Specifically, Petitioner

directs the court to the following statements:

> With Mr. Ahluwalia, he would get quiet or he would get totally
> unresponsive.  He was off on another topic, start talking about
> something else, something else, giving himself time to think before
> he gets around to the answer, or the officer has to say well, my
> question was this.  That is something people do when they are lying.
>
> . . .
>
> You have to listen to the video carefully on this one.  When the
> officer starts asking Mr. Ahluwalia about, you know, where he went,
> that's like pulling teeth on that one.  And he starts giving him
> opportunities to come forward on the truth...

(Lodged Doc. 11 at 677-79).

Petitioner has failed to demonstrate that the prosecutor's statements constitute

improper commentary on his post arrest silence.  After reviewing the videotape of the interrogation,

it cannot reasonably be argued that the statements by the prosecutor refer to any silence on the part

of Petitioner.  While Petitioner's voice dropped to a low tone on occasion, and at times he was quiet

as he listened to Detective Keller speak and ask questions, Petitioner spoke continuously with

Detective Keller throughout the course of the interview and never unambiguously invoked his right

to remain silent.  It is noted, however, that CALJIC 2.71.5 is also applicable in cases where an

accused makes "false, evasive or contradictory statements" in the face of an accusation.  Here,

Petitioner's answers to the detective's questions were often "unresponsive," as noted by the

prosecutor, in the sense that he failed to answer certain questions directly, changed the subject,

interrupted the detective, answered questions by asking other questions, and in some cases, provided

irrelevant answers.  The prosecutor's commentary, in the context of the videotape of Petitioner's

interview, can thus not be interpreted as referring to any constitutionally protected silence.

Petitioner has failed to demonstrate any constitutional error in either the jury instruction or the prosecutor's argument that "so infected [his] entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 71-72. The California Court of Appeals denial of Petitioner's claim was not contrary to or an unreasonable application of clearly established federal law. Petitioner is not entitled to federal *habeas corpus* relief on this claim.

**B. Confrontation Clause**

Petitioner makes two separate Confrontation Clause claims. According to Petitioner, his right to confrontation was violated when (1) cross examination of complaining witness Manjit Walia was "curtailed," and (2) when damaging hearsay evidence of an unknown origin was presented at trial through the testimony of Detective Keller.

As noted above, absent some federal constitutional violation, a violation of state evidentiary law does not ordinarily provide a basis for federal *habeas corpus* relief. *Estelle v. McGuire*, 502 U.S. at 67-68. Accordingly, a state court's evidentiary ruling, even if erroneous, is grounds for federal *habeas corpus* relief only if it renders the state proceedings so fundamentally unfair as to violate due process. *Drayden v. White*, 232 F.3d 794, 710 (9th Cir. 2000); *Spivey v. Rocha*, 194 F.3d 971, 977-78 (9th Cir. 1999); *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).

The right to confront witnesses, guaranteed by the Sixth and Fourteenth Amendments, includes the right to cross-examine adverse witnesses to attack their general credibility or show their possible bias or self interest in testifying. *Olden v. Kentucky*, 488 U.S. 227, 231 (1988); *Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986); *Davis v. Alaska*, 415 U.S. 308, 316 (1973); *United States v. Larson*, 460 F.3d 1200, 1206 (9th Cir. 2006). A Confrontation Clause violation occurs where the defendant is prevented from investigating "a prototypical form of bias" if "[a] reasonable jury might have received a significantly different impression of [the witness'] credibility had respondent's counsel been permitted to pursue his proposed line of cross-examination." *Van Arsdall*, 475 U.S. at 680. However, "[t]rial judges retain wide latitude insofar

at the Confrontation Clause is concerned" and may impose limitations on cross-examination that are "reasonable," *id.* at 679, and are not "arbitrary or disproportionate to the purposes they are designed to serve." *Michigan v. Lucas*, 500 U.S. 145, 150 (1991). "The Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Van Arsdall*, 475 U.S. at 679 (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)).

The denial of a defendant's opportunity to impeach a witness for bias is subject to harmless error analysis. *Van Arsdall*, 475 U.S. at 684; *Bockting v. Bayer*, 399 F.3d 1010, 1020 (9th Cir. 2005) ("Confrontation Clause violations are subject to harmless error analysis and thus may be excused depending on the state of the evidence at trial"). Thus Petitioner is not entitled to relief on either of his confrontation clause claims unless he can establish that the trial court's error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). *See also Forn v. Hornung*, 343 F.3d 990, 999 (9th Cir. 2003) (finding that a Confrontation Clause error did not have a "substantial and injurious" effect on the verdict and that the error was therefore harmless.). In determining whether the error was harmless, the court considers a variety of factors, including: (1) the importance of the witness' testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of the cross-examination otherwise permitted; and (5) the overall strength of the prosecution's case. *See Van Arsdall*, 475 U.S. at 684.

In order to grant habeas relief where a state court has determined that a constitutional error was harmless, a reviewing court must determine: (1) that the state court's decision was "contrary to" or an "unreasonable application" of Supreme Court harmless error precedent, and (2) that Petitioner suffered prejudice under *Brecht* from the constitutional error. *Inthavong v. LaMarque*, 420 F.3d 1055, 1059 (9th Cir. 2005). *See also Mitchell v. Esparza*, 540 U.S. 12, 17-18 (2003) (when a state court determines that a constitutional error is harmless, a federal court may not

1  award *habeas corpus* relief under § 2254 unless that harmlessness determination itself was

2  unreasonable).  Both of these tests must be satisfied before relief can be granted.  *Inthavong*, 420

3  F.3d at 1061.  *See also Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) ("in § 2254 proceedings a federal

4  court must assess the prejudicial impact of constitutional error in a state-court criminal trial under

5  the 'substantial and injurious effect' standard set forth in [*Brecht*] whether or not the state appellate

6  court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable

7  doubt' standard set forth in [*Chapman v. California*]").

8        **1.**     **Manjit Walia**

9        Petitioner claims that his Sixth Amendment right to confrontation was violated when

10  cross examination of Manjit Walia regarding whether he was lying about his wife's cause of the

11  death was "curtailed."  Specifically, Walia was questioned by the prosecutor regarding the death of

12  his wife as follows:

13          Q:    Did your wife die in India?

14          A:    Yes.

15          Q:    When did your wife die?

16          A:    I don't want to answer this one.

17          Q:    Could you tell us what she died of?

18          [DEFENSE COUNSEL]:    I'll object.

19          THE COURT:    I'd overrule it.  You may answer it.

20          THE WITNESS:    When she died?

21          Q:    What did she die of?

22          A:    She was sick.

23          Q:    Did she die of cancer?

24          A:    Yes, cancer.

25  (Lodged Doc. 11 at 344-45).  According to Petitioner, Walia's application for political asylum in

26  the United States claims that his wife was arrested and killed by the Punjab police.  Petitioner thus

attempted to impeach Walia at trial by questioning him as follows:

> Q:   Well, you told us under oath that your wife died of cancer, true?
>
> A:   One reason was cancer.
>
> Q:   But you told INS that she had died as a result of a beating that she had received from the police in India; isn't that true?
>
> A:   This is – this is – this is related to my asylum.  If we could not – if we don't talk about this, I would –
>
> Q:   Well, it's related to your asylum because that is your claim for asylum, that your wife got beaten to death by the Indian police; isn't that true?
>
> A:   You know, whatever I have claimed in asylum, you know, we have claimed that.  I'll be thankful if you don't talk about this one because my case is still pending; it's not final yet.
>
> Q:   Do you not remember what you told the Sacramento Police Department – well, strike that.  Let me start over again.  Do you not remember what you told the D.A. investigator on January 7th, 2002, about your asylum application?
>
> A:   What?
>
> Q:   Do you not remember that you told the investigator for the district attorney that the police in India had been harassing your family members, that they raided your house, that your wife was arrested, kept overnight, that she was beaten so badly that she died later in the hospital?  You don't remember that's what you told the investigator from the prosecutor's office about your asylum status here?
>
> A:   I mean, this is related to asylum.  This is not related to the – with this case, with them – with them.
>
> Q:   But your wife died of cancer, true?
>
> A:   I have requested you before, the reason was – one reason was cancer.
>
> Q:   All right.  And your wife did not die because she was beaten by the Indian police, true?
>
> A:   This is – this is a separate issue.
>
> Q:   You lied to the INS, didn't you?

1              [PROSECUTOR]:                Objection, your Honor, 352.

2              THE WITNESS:               No, I don't lie.

3              [DEFENSE COUNSEL]:    I think it goes directly to his credibility, bias and motive.

THE COURT:       I'd sustain.  I'd sustain.

Q:     Harpal Ahluwalia knew the true facts?

A:     He was my family member.  He knows the truth.  You know, what he's saying I don't know.

Q:     He knows the truth, and you were afraid and your sister were afraid that he would call INS and that you would be deported back to India; isn't that true?

A:     Why would I be afraid?  He's always make [sic] up things.  I mean, whatever he's going to do, he's not going to ask me first.

[DEFENSE COUNSEL]:    That's all I have, your Honor.

(Lodged Doc. 11 at 358-60).

The California Court of Appeal, Third Appellate District, considered and rejected Petitioner's claim on the merits, explaining its reasoning as follows:

> Defendant claims his right to confrontation was violated because he was not permitted to cross examine his victim, Manjit Walia, the brother-in-law, regarding the veracity of his asylum petition with the United States.  Walia filed an asylum petition on the basis that his wife was beaten to death by the Indian police.  Defendant asserts Walia's wife actually died of cancer and that Walia committed perjury in his asylum application.  Throughout defendant's questioning of Walia regarding the asylum petition, Walia requested that they not to [sic] discuss the issue because it was not related to the present case.  However, defendant continued to question Walia about the petition.  Defendant complains that when he asked Walia whether he lied to the Immigration and Naturalization Service (INS) about the reason for the asylum petition, the trial court erred in sustaining an Evidence Code section 352 objection.
>
> . . .
>
> Although the objection was arguably sustained ("I'd sustain"), the question had already been answered and the prosecution neither sought nor obtained an order striking the answer.  Accordingly, defendant's argument is without merit because the question was

answered.  He cannot complain about exclusion of evidence that was not effectively excluded.

Defendant claims the witness's request not to discuss the asylum petition was "an outrageous and unsupportable position." Defendant, however, did not ask the court to instruct the witness to respond.  We reverse for judicial error, not witness error.  Defendant must preserve these issues for appeal by objection.  Therefore, we need not reach the merits of this claim.

(Lodged Doc. 3 at 17-19.)

The conclusion of the state appellate court that Petitioner's right to confront witnesses against him was not violated when the trial judge sustained the prosecution's objection to questioning Manjit Walia regarding whether he lied on his asylum application is not contrary to or an unreasonable application of the federal principles discussed above.  As the state appellate court noted, even though the prosecution's objection to defense counsel's question was sustained, Walia had already answered the question.  In fact, as the appellate court further noted, no motion to strike his answer from the record was made or limiting instruction was given to the jury regarding whether his answer should or should not be considered as evidence.  Moreover, Petitioner's allegation that the questioning of Walia regarding the veracity of the statements contained in his asylum application was "curtailed" is without merit.  The record reflects that, following the prosecution's objection, defense counsel continued to question Walia without objection regarding the true circumstances of his wife's death.  Further, prior to the objection, the jury was made aware of the alleged discrepancies between Walia's trial testimony regarding his wife's death and the information provided by him on his INS application for asylum.  Thus, even assuming that the trial court erred in sustaining the prosecution's objection, Petitioner cannot show that the trial court's decision had a "substantial and injurious effect or influence" on the jury's verdict.  *Brecht*, 507 U.S. at 619. Petitioner's jury was advised of sufficient information to enable it to effectively assess Walia's credibility and to "appropriately draw inferences relating to the reliability of the witness."  *Van Arsdall*, 475 U.S. at 680.  Accordingly, Petitioner is not entitled to federal *habeas corpus* relief on this claim.

### 2.     Detective Keller

Petitioner next claims that his Sixth Amendment right to confrontation was violated when hearsay evidence of an unknown origin was presented at trial through the testimony of Detective Keller regarding communications between Petitioner and Carlos Ramirez, one of the two men who Petitioner was accused of soliciting to commit the murder of his wife and brother in law. The California Court of Appeal, Third Appellate District, considered and rejected Petitioner's claim on the merits, explaining its reasoning as follows:

> Defendant claims the trial court erred in admitting testimony of Detective Keller because it was hearsay and because it denied defendant his Sixth Amendment right to confrontation. The testimony involved the transmitted communication between [Carlos] Ramirez and defendant. During his testimony, Detective Keller testified he was able to hear "bits and pieces" of the conversation between Ramirez and defendant. In response to questioning about how he knew that Ramirez and defendant might be traveling to Redwood City, Detective Keller responded as follows:

> > [Detective Keller]:     There was conversation, and I don't recall if I heard it over the wire or if it was being relayed to me by other detectives that were monitoring the wire.

> Following overruled objections to the statement on the grounds of hearsay, speculation, and lack of personal knowledge, Detective Keller continued:

> > [Detective Keller]:     It was conveyed to me that there was talk of them going to Redwood City to point out the second victim's residence."

> Detective Keller was not able to identify from whom he received information that Ramirez and defendant might be traveling to Redwood City. Detective Keller believed either another officer or he himself had heard it over the wire. Based on this information, Detective Keller approached Ramirez at Home Depot while defendant was inside and advised Ramirez not to travel with defendant to Redwood City.

> Defendant claims Detective Keller's statement denied defendant his right to confront a witness under the confrontation clause as interpreted in *Crawford*. However, the confrontation clause applies to "'witnesses'" against the accused – in other words, those who

'bear testimony.'" (*Crawford v. Washington* (2004) 541 U.S. 36, 51 [158 L.Ed.2d 177, 192].) "'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" (*Ibid.*) Testimonial statements are "*ex parte* in-court testimony or its functional equivalent." (*Ibid.*) Here, the out-of-court statement that Detective Keller heard from an unknown person that defendant and Ramirez were going to travel to Redwood City was not testimonial and, therefore, defendant' assertion that the statement violates the confrontation clause fails.

Defendant also argues this statement was made by an unknown declarant, for the truth of the matter asserted, and should have been excluded as inadmissible hearsay. We will assume, for the purpose of argument, that the trial court should have sustained the hearsay objection. Improper admission of hearsay evidence is tested to determine whether a different verdict would have been probable without the error. (*People v. Reed* (1996) 13 Cal.4th 217, 231; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Here, defendant is unable to show that any alleged error was harmful. The substance of the hearsay statement, that one of the intended victims lived in Redwood City, was revealed to the jury by other means. The surveillance tapes played for the jury contained several references to Redwood City. For example, defendant, on the tape, referred to one of the victims as a man in Redwood City. Therefore, even if the hearsay statement was improperly admitted, it is not probable defendant would have obtained a more favorable result without the error.

(Lodged Document 3 at 19-21.)

The appellate court thus determined that any alleged error the trial court may have committed by failing to exclude Detective Keller's testimony was harmless, thus *habeas corpus* relief may only be granted if the harmlessness determination itself was objectively unreasonable, which it was not. *Mitchell*, 540 U.S. at 17-18. Even assuming *arguendo* that Detective Keller's testimony was improperly admitted at trial, Petitioner failed to establish any resulting prejudice because Detective Keller's testimony duplicated other evidence presented to the jury that Petitioner contemplated accompanying Ramirez to Redwood City to target one of the victims. Specifically, the transcript of a tape recorded conversation, as well as the tape itself, was admitted into evidence and presented to the jury. The transcript reflects the following conversation between Ramirez and Petitioner:

[PETITIONER]:        Uh ---- woman is over here.  It's easy to do

37

1        and man is in Redwood City.

2    [RAMIREZ]:   So it's two?

3    [PETITIONER]:  Yeah.  Man in Redwood City.  I don't know how ----

4

5    [RAMIREZ]:   Where is that ---- where's that place?

6    [PETITIONER]:  He's ---- the man in Redwood City.

7    [RAMIREZ]:   Red ----

8    [PETITIONER]:  They stay right by the Bay Area.

9    [RAMIREZ]:   The Bay Area?

10    [PETITIONER]:  Redwood City.  He lives there.

11    [RAMIREZ]:   Oh.

12    [PETITIONER]:  And, uh ---- I don't know we will be able to catch him or not ---- if we can catch him, I could show his place out to where he live, you know.  I have his phone number at the house but, you know ---- I don't know how to ---- but at least we can fix ---- the sister will be there.  See and the man (Unintelligible).

15 (Lodged Doc. 10 at 655-56.)  In light of the admission into evidence of written transcript and audio

16 tape of the above conversation, the California Court of Appeal's conclusion that the admission of

17 Detective Keller's testimony was harmless is neither contrary to, nor an unreasonable application

18 of clearly established federal harmless error jurisprudence.  *See Fry v. Pliler*, 551 U.S. 112, 339

19 (2007) (in order to grant federal *habeas corpus* relief where a state court has determined that a

20 constitutional error was harmless, a reviewing court must determine that the state court's decision

21 was contrary to or an unreasonable application of Supreme Court harmless error precedent, and that

22 the petitioner suffered prejudice under *Brecht* from the constitutional error).  Petitioner has failed

23 to demonstrate how the admission of Detective Keller's cumulative testimony regarding the

24 conversation between Petitioner and Ramirez about Redwood City had "a substantial and injurious

25 effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. at 637.  *See*

*also Van Arsdall*, 475 U.S. at 684 (factors to consider when conducting a harmless error analysis for an alleged confrontation clause error include"the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case"). Petitioner is not entitled to federal *habeas corpus* relief on this claim.

**C. Ineffective Assistance of Trial Counsel**

Petitioner claims that his trial counsel rendered ineffective assistance by (1) failing to adequately investigate the known drug and mental health problems of Carlos Ramirez; (2) failing to adequately investigate and cross-examine Manjit Walia; (3) failing to present a defense; and (4) as a result of the cumulative effect of several alleged errors.

The Sixth Amendment to the United States Constitution guarantees the effective assistance of counsel. The United States Supreme Court set forth the test for determining whether counsel's assistance was ineffective in *Strickland v. Washington*, 466 U.S. 668 (1984). To support a claim that counsel's performance was ineffective, a petitioner must first show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. *Id* at 687-88. After a petitioner identifies the acts or omissions that are alleged not to have been the result of reasonable professional judgment, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. *Id*. at 690; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). Second, a petitioner must establish that he was prejudiced by counsel's deficient performance. *Strickland*, 466 U.S. at 693-694. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id. See also Williams v. Taylor*, 529 U.S. 362, 391-92 (2000); *Laboa v. Calderon*, 224 F.3d 972, 981 (9th Cir. 2000).

39

A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Pizzuto v. Arave*, 280 F.3d 949, 955 (9th Cir. 2002) (citing *Strickland*, 466 U.S. at 697). In assessing an ineffective assistance of counsel claim, "[t]here is a strong presumption that counsel's performance falls within the 'wide range of professional assistance.'" *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). A petitioner claiming ineffective assistance of counsel must overcome the strong presumption that, considering all of the circumstances, counsel's actions "might be considered sound trial strategy," *Strickland*, 466 U.S at 689, and that counsel "exercised acceptable professional judgment in all significant decisions made." *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir. 1990) (citing *Strickland*, 466 U.S. at 689). Thus, a reasonable tactical decision by counsel with which the defendant disagrees cannot form the basis of an ineffective assistance of counsel claim. *Strickland*, 466 U.S. at 689. The court does not consider whether another lawyer with the benefit of hindsight would have acted differently than trial counsel. *Id*. Instead, the court considers whether counsel made errors so serious that counsel failed to function as guaranteed by the Sixth Amendment. *Id*. at 687.

### 1. Failure to Investigate

Petitioner contends in two separate but related claims that trial counsel was ineffective for failing to investigate the known drug and mental health problems of prosecution witness Carlos Ramirez, as well as for failing to adequately investigate and cross examine prosecution witness Manjit Walia. Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "This includes a duty to . . . investigate and introduce into evidence records that demonstrate factual innocence, or that raise sufficient doubt on that question to undermine confidence in the verdict." *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001) (citing *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999)). In this regard, it has been recognized that "the

1   adversarial process will not function normally unless the defense team has done a proper

2   investigation." *Siripongs v. Calderon* (*Siripongs II*), 133 F.3d 732, 734 (9th Cir. 1998) (citing

3   *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986)).   Therefore, counsel must, "at minimum,

4   conduct a reasonable investigation enabling him to make informed decisions about how best to

5   represent his client." *Hendricks v. Calderon*, 70 F.3d 1032, 1035 (9th Cir. 1995) (quoting *Sanders*

6   *v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994) (internal citations and quotations omitted)).   On the

7   other hand, where an attorney has consciously decided not to conduct further investigation because

8   of reasonable tactical evaluations, his or her performance is not constitutionally deficient.   *See*

9   *Siripongs II*, 133 F.3d at 734; *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998); *Hensley*

10  *v. Crist*, 67 F.3d 181, 185 (9th Cir. 1995).   "A decision not to investigate thus 'must be directly

11  assessed for reasonableness in all the circumstances.'" *Wiggins*, 539 U.S. at 533 (quoting *Strickland*,

12  466 U.S. at 691).   *See also Kimmelman*, 477 U.S. at 385 (counsel "neither investigated, nor made

13  a reasonable decision not to investigate"); *Babbitt*, 151 F.3d at 1173-74.   A reviewing court must

14  "examine the reasonableness of counsel's conduct 'as of the time of counsel's conduct.'" *United*

15  *States v. Chambers*, 918 F.2d 1455, 1461 (9th Cir. 1990) (quoting *Strickland*, 466 U.S. at 690).

16  Moreover, "'ineffective assistance claims based on a duty to investigate must be considered in light

17  of the strength of the government's case.'" *Bragg*, 242 F.3d at 1088 (quoting *Eggleston v. United*

18  *States*, 798 F.2d 374, 376 (9th Cir. 1986)).

19          **a.  Carlos Ramirez**

20          Petitioner claims that trial counsel failed to fully investigate the known drug problems

21  and psychological impairments of prosecution witness Carlos Ramirez and failed to challenge

22  Ramirez's competence to testify at trial.   Specifically, Petitioner points out bizarre behavior

23  exhibited by Ramirez on the witness stand, including offering a prayer, asking the judge to look near

24  his right foot for a non-existent box of purple files, offering an opinion regarding the health of the

25  judge's daughter, and at one point lapsing into a trance-like state.   According to Petitioner, after

26  viewing Ramirez's behavior on the witness stand, trial counsel should have sought Ramirez's

medical records regarding his drug use and mental illness and moved for a court order that Ramirez

be examined by a qualified health professional to determine his competence to testify.  Petitioner

claims he was prejudiced by counsel's deficiency because Ramirez was used by the prosecution to

introduce various items of evidence, including taped conversations in which he participated and

statements he made to the police, that otherwise would not have been admitted as evidence against

Petitioner at trial.

The Sacramento County Superior Court considered and rejected Petitioner's

ineffective assistance claim to the extent it was based on counsel's failure to investigate on the

merits, explaining its reasoning as follows:

> Petitioner claims that Ramirez was not competent to testify due to his
> past drug use and abuse. He argues that Ramirez's incompetence was
> demonstrated by documents produced during informal discovery.
> However, the petition does not attach any documents having any
> bearing on Ramirez's competence to recall or testify.  Petitioner also
> contends that Ramirez's behavior during trial showed that he was
> incompetent to testify.  Since that behavior was demonstrated in open
> court, the jury had the opportunity to consider it and determine for
> itself whether Ramirez's testimony was credible.  Since Petitioner has
> shown neither what evidence counsel should have obtained or
> investigated about Ramirez's prior drug use nor how any cross-
> examination of Ramirez would have affected his credibility,
> Petitioner has not shown that counsel was ineffective.

(Lodged Doc. 7 at 1-2).

A review of the transcript of Petitioner's trial reflects that his trial counsel was aware

of Ramirez's history of drug use and questioned him about it extensively on cross-examination.

Moreover, when Ramirez exhibited the bizarre behavior described above, the record reflects that the

trial judge asked Ramirez whether he was taking any medication, and trial counsel made a brief

inquiry regarding whether Ramirez was being treated for any mental health problems and whether

he heard voices talking to him.  As explained above, "[c]ounsel's competence . . . is presumed and

the [petitioner] must rebut this presumption by proving that his attorney's representation was

unreasonable under prevailing professional norms and that the challenged action was not sound

strategy."  *Kimmelman*, 477 U.S. at 384.  The court does not consider whether, with the benefit of

42

1  hindsight, another lawyer would have acted differently.  *Strickland*, 466 U.S. at 689.  Here,

2  Petitioner has failed to meet the heavy burden of demonstrating that counsel's tactical decision not

3  to conduct further investigation into Ramirez's mental competence was objectively unreasonable.

4       Moreover, even assuming *arguendo* that trial counsel's performance in failing to

5  investigate Ramirez's competence to testify as a witness was deficient, Petitioner has failed to

6  demonstrate any prejudice resulting therefrom.  In this case, there is no indication that an attack to

7  Ramirez's competency as a witness would have resulted in his disqualification as a witness.  The

8  general rule in California is that "every person, irrespective of age, is qualified to be a witness and

9  no person is disqualified to testify in any matter."  CAL. EVID. CODE § 700.  The exception to this

10  rule disqualifies a person from acting as a witness to an action if that person is "(1) [i]ncapable of

11  expressing himself or herself concerning the matter so as to be understood, either directly or through

12  interpretation by one who can understand him; or (2) incapable of understanding the duty of a

13  witness to tell the truth."  CAL. EVID. CODE § 701(a).  Thus, under California law, Ramirez was

14  presumed qualified as a witness.  While Ramirez's behavior and demeanor during cross-examination

15  may be been strange, Petitioner has not presented evidence, and the record does not reflect,  that

16  Ramirez could not express himself sufficiently or understand that he must recount the facts

17  truthfully.

18       A witness who is qualified as a witness under the California Evidence Code must

19  nonetheless "have personal knowledge of the subject of the testimony, based on the capacity to

20  perceive and recollect."  *See People v. Montoya*, 149 Cal.App.4th 1139 (2007).  Here, Petitioner

21  does not allege that Ramirez lacked personal knowledge to testify.  Rather, Petitioner complains that

22  Ramirez's testimony was "rambling, evasive and incoherent," noting specifically that Ramirez

23  testified that he was a drug addict at the time he initiated the case with the police, was confused

24  about the events of the case, made up stories about and to another witness, went to the police

25  because he was desperate and confused, and he was touched by the spirit.  (Traverse at 26-27.)

26  "Whether [a witness] did perceive accurately, does recollect, and is communicating accurately and

43

truthfully are questions of credibility to be resolved by the trier of fact." *People v. McCaughan*, 49 Cal.2d 409, 420 (1957). Thus to the extent that, as Petitioner alleges, Ramirez's testimony consisted of "incoherent rambling" that "add[ed] layers of confusion to his testimony with practically every question asked of him," these allegations are insufficient to support a claim that Ramirez was incompetent to testify at trial. The state appellate court properly concluded that the jury had the opportunity to observe Ramirez's demeanor, testimony, and behavior and to determine his credibility. Petitioner is thus not entitled to *habeas corpus relief* on this claim.

### b. Manjit Walia

Petitioner next claims that trial counsel failed to adequately investigate and cross examine prosecution witness Manjit Walia.. Specifically, Petitioner contends that Walia perjured himself during trial when he testified that his wife died of cancer after previously claiming in a sworn application for political asylum that she had been killed by the Indian police.

The Sacramento County Superior Court considered and rejected Petitioner's claim on the merits, explaining its reasoning as follows:

> Petitioner claims that trial counsel failed to expose the fact that Walia committed perjury on his application for asylum, which would have impeached his credibility and testimony. Specifically, Petitioner states that Walia's asylum application included an allegation that Walia's wife was murdered, when in fact she died of cancer. According to the opinion on appeal, trial counsel did ask Walia whether he had lied to the INS, to which Walia replied that he did not. The petition includes a one-page document purporting to be an attachment to Walia's asylum application, which states that Walia's wife was killed by the police in India. However there is no evidence that Walia's wife died of cancer, as claimed by Petitioner, which would make the statement on the asylum application perjury. Petitioner has not shown that counsel [sic] conduct was deficient since he has not shown what counsel would have discovered if he had further investigated or cross-examined Walia.

(Lodged Doc. 7 at 2).

The Superior Court correctly recognized that Petitioner, in support of his claim, submitted a document alleged to be an attachment to form I-589, Walia's U.S. Citizenship and Immigration Services Application for Asylum. (Traverse at Ex. 1). With this document, Walia

appears to claim that his "wife was arrested and killed by the Punjab police...[and] due to fear of police [Walia] left India and arrived in the USA." *Id.* However, the Superior Court's discussion of Petitioner's failure to provide any evidence that Walia's wife, in fact, died of cancer overlooks Walia's trial testimony, in which he clearly stated that his wife died of cancer and refused to discuss any of the information provided by him in reference to his wife's death on his asylum application. *See* (Lodged Doc. 11 at 358-60). Nonetheless, Petitioner is not entitled to relief on this claim.

As stated above, counsel is at least obligated to "conduct a reasonable investigation enabling him to make informed decisions about how best to represent his client." *Hendricks*, 70 F.3d at 1035 (quoting *Sanders*, 21 F.3d at 1456 (internal citations and quotations omitted)). Here, it is evident that trial counsel was aware of the discrepancies between Walia's trial testimony and the information provided on his asylum application regarding the death of his wife. The relevant portions of trial counsel's cross examination of Walia on his inconsistent explanations for his wife's death have already been summarized in subsection (V)(C)(1), above. As previously explained, the record reflects that trial counsel did, in fact, question Walia regarding his trial testimony that his wife died of cancer and his asylum application in which he claims his wife was killed by the Punjab police. Although the prosecution's objection to trial counsel's inquiry as to whether Walia had lied to INS about his wife's death was sustained, Walia did, in fact answer the question by stating that he did not lie. As previously noted, his response was not stricken from the record and no limiting instruction was given to the jury. Whether trial counsel decided not to press the specific question of whether Walia lied to INS based on the trial court's ruling or some other tactical reason, it cannot be said that counsel was deficient for failing to investigate Walia or cross examine him based on the results of counsel's investigation. Moreover, following the prosecution's objection, trial counsel asked several more questions of Walia regarding his conflicting explanations of his wife's death. As explained above, Petitioner's jury was advised of sufficient information to enable it to effectively assess Walia's credibility and to "appropriately draw inferences to the reliability of the witness." *Van Arsdall*, 475 U.S. at 680. Trial counsel's decision on whether or how to best impeach a witness

is generally deemed a strategic one, shielded by the *Strickland* presumption that counsel acted reasonably. *United States v. Lindsay*, 157 F.3d 532, 535-36 (7th Cir. 1998). *But see Reynoso v. Giurbino*, 462 F.3d 1099, 1114 (9th Cir. 2006). In this case, Petitioner has presented nothing to rebut the presumption that counsel's decisions were reasonable. Petitioner is not entitled to federal *habeas corpus* relief on this claim.

### 2. Failure to Present Petitioner's Defense

Petitioner claims trial counsel rendered ineffective assistance by failing to inform Petitioner that he had a constitutional right to testify on his own behalf, and thus Petitioner did not testify at trial despite his great desire to do so.[6] According to Petitioner, "counsel made the tactical decision to forgo presenting any defense, stating to Petitioner, 'the state failed to prove its case.'" (Pet. at 34.) Petitioner claims he disagreed with counsel and wanted the jury to hear his "side of the story," which was that Petitioner "is an immigrant from India, a member of the Sikh religious group, and it is not uncommon in Sikh culture to believe there are 'special people' that possess the ability to place a curse on someone when inclined to do so, and Petitioner believe[d] at the time of the alleged crime a curse had been placed on him." *Id*. Lastly, Petitioner claims he provided trial counsel with the names of two doctors who had treated him in the past and were aware of his belief that he had been cursed. (Pet. at 35.)

The Sacramento County Superior Court considered and rejected Petitioner's claim on the merits, explaining its reasoning as follows:

> Petitioner claims that counsel should have presented evidence that Petitioner did not actually intend that the victims be killed. The evidence consisted of Petitioner's own testimony that he believed it was necessary to remove a "curse" that was on him and the testimony of various psychiatric professionals who would have testified that Petitioner had this belief. Related to this, Petitioner argues that counsel never informed Petitioner of his right to testify on his own behalf. First, the Petition does not include any evidence that

---

[6] Petitioner also contends that the trial court failed to advise him that he had a constitutional right to testify on his own behalf. The trial court, however, was under no obligation to advise Petitioner of his right to testify. *United States v. Edwards*, 897 F.2d 445 (9th Cir. 1990).

46

Petitioner wanted to testify or that counsel prevented him from doing so. Second, there is no evidence of how the proposed expert witnesses would have testified. Third, Petitioner acknowledges that he *disagreed* with counsel's decision not to present the defense and instead argue that the prosecutions evidence was insufficient to convict. The petition also explicitly states that trial counsel did not want to present the defense because the jury would not accept it and Petitioner and counsel would look foolish presenting such a defense (Petition at p. 9.) This decision falls squarely with counsel's tactical choices, which cannot be described as unreasonable in light of the proposed defense. As a result, Petitioner has not presented a prima facie case of ineffective assistance of counsel.

(Lodged Doc. 7 at 2).

Petitioner has failed to demonstrate ineffective assistance of counsel arising from his counsel's alleged failure to advise him of his constitutional right to testify on his own behalf. Counsel made a tactical decision not to have Petitioner testify, and Petitioner's failure to inform the trial court that he wished to testify constituted a waiver of that right. When "a defendant is silent in the face of his attorney's decision not to call him as a witness, he has waived the right to testify" and is precluded from premising a claim of ineffective assistance on that ground. *United States v. Nohara*, 3 F.3d 1239, 1244 (9th Cir. 1993) (citing *United States v. Edwards*, 897 F.2d 445 (9th Cir 1990)). The record does not show that petitioner ever indicated to the trial court that he intended to testify over counsel's objections or advice. To the contrary, when counsel informed the trial court that "my client intends to accept my advice and forego his right to testify," Petitioner remained silent. (Lodged Doc. 11 at 615.)

Petitioner has also failed to demonstrate that, in his words, counsel's "tactical decision to forgo presenting any defense" was unreasonable. According to Petitioner, he and trial counsel disagreed over whether to present Petitioner's belief that he had been cursed to the jury. However, a difference of opinion as to trial tactics does not constitute denial of effective assistance. *See United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981). Tactical decisions of trial counsel deserve deference when: (1) counsel in fact bases trial conduct on strategic considerations; (2) counsel makes an informed decision based upon investigation; and (3) the decision appears

reasonable under the circumstances.  *See Sanders*, 21 F.3d at 1456.  at 689.  The relevant inquiry is not what counsel could have done, but rather whether the choices made by defense counsel were reasonable.  *See Siripongs*, 133 F.3d at 736; *Babbitt*, 151 F.3d at 173.  Here, the record reflects that trial counsel defended Petitioner through pre-trial motions, opening[7] and closing statements, and by vigorously cross examining each of the prosecution's witnesses, but made the strategic decision to decline to present any testimonial evidence and instead choosing to rely on the state of the evidence. (Lodged Doc. 11 at 615.)  As previously noted, judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S.  *See also Bell v. Cone*, 535 U.S. 685, 701-02 (2002) (approving of a strategic decision to waive closing argument in order to prevent the prosecutor from having an opportunity at a rebuttal closing); *Hovey v. Ayers*, 458 F.3d 892, 906 (9th Cir. 2006) ("deference owed to the choices made by defense counsel in crafting summations").  Strategic decisions made by trial counsel are not ineffective assistance merely because in retrospect, other tactics were known to have been available.  *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984).

Likewise, Petitioner's claim that trial counsel rendered ineffective assistance by declining to interview and present the testimony of the two doctors he claims would have corroborated his belief that a curse had been placed upon him must fail.  Petitioner cannot meet his burden of demonstrating ineffective assistance of counsel merely by presenting the "mere conclusory statements" that these two doctors would have testified favorably on his behalf.  *United States v. Schaflander*, 743 F.2d 714, 721 (9th Cir. 1984).  Rather, he must tender affidavits from the witnesses who he contends his counsel neglected to interview or call, showing the helpful testimony for the defense that they could have presented.  Petitioner has failed to do so.  *See Wildman v.*

---

[7] Pursuant to the California Rules of Court, counsels' opening statements were not included as a part of the appellate transcript, but the record reflects that trial counsel gave an opening statement on behalf of Petitioner.

*Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (no ineffective assistance where petitioner speculated that an arson expert would have offered helpful testimony at his trial); *Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000) (no ineffective assistance  where there was "no evidence in the record that th[e] witness actually exist[ed]" and the petitioner  failed to present an affidavit from the witness establishing that "the witness would have provided helpful testimony for the defense"); *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) (speculating as to what a proposed witness would say is not enough to establish prejudice); *United States v. Harden*, 846 F.2d 1229, 1231-32 (9th Cir. 1988) (no ineffective assistance because of counsel's failure to call a witness where, among other things, there was no evidence in the record that the witness would testify).  Petitioner is not entitled to federal *habeas corpus relief* on this claim.

### 3.  Cumulative Errors

Petitioner claims even if alleged errors committed by trial counsel did not render his assistance ineffective, that the overall cumulative effect of counsel's errors did constitute ineffective assistance of counsel.  Specifically, Petitioner claims that counsel failed (1) to object to the use of his videotaped interrogation at trial on the grounds that it was obtained in violation of *Miranda*; (2) to object to the testimony of Petitioner's wife regarding prior acts of domestic violence; (3) to preserve Petitioner's right to confrontation; and (4) to object to the imposition of the upper term sentence, in violation of Petitioner's Sixth Amendment rights.  In addition, Petitioner contends that his three individual ineffective assistance of counsel claims discussed and rejected in the subsections above merit a finding that counsel's cumulative errors constituted ineffective assistance of counsel.

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still result in prejudice sufficient to warrant *habeas corpus* relief.  *See Alcala v. Woodford*, 334 F.3d. 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors rendered hindered defense efforts to challenge prosecution's evidence); *Harris v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995) (granting *habeas corpus* relief where trial counsel's performance was deficient in eleven different ways, resulting in

1   cumulative prejudice).  However, where no individual error rises to the level of a constitutional

2   defect, the sum of the errors cannot accumulate to the level of a constitutional violation.  *See*

3   *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002); *Fuller v. Roe*, 182 F.3d 699, 704 (9th Cir.

4   1999).

5          Petitioner's cumulative error claim must fail.  First, as discussed in subsection

6   (V)(A), above, Petitioner's videotaped statement was not obtained in violation of his *Miranda* rights

7   because the questions asked of him prior to being informed of his rights under *Miranda* were not

8   reasonably likely to elicit incriminating answers.  *Pope*, 69 F.3d at 1023 (quoting *Innis*, 446 U.S.

9   at 301).  *See also Muniz*, 496 U.S. at 600-02 (1990).   Moreover, Petitioner voluntarily waived his

10  rights under *Miranda* and elected to speak with Detective Keller.  Thus, even assuming counsel was

11  ineffective for failing to object to the admission of his videotaped statement, Petitioner has failed

12  to demonstrate any resulting prejudice.

13         Second, Petitioner's claim that trial counsel failed to object to the testimony of

14  Petitioner's wife regarding prior acts of domestic violence is without merit.  The record reflects that,

15  in fact, trial counsel filed two motions *in limine* to exclude any reference to allegations that

16  Petitioner had abused his wife.  The first motion, based on section 1101 of the California Evidence

17  Code regarding evidence of character to prove conduct, was denied.  The second motion, based on

18  section 1200 of the California Evidence Code regarding admissibility of hearsay statements, was

19  granted.

20         Third, as discussed in subsections (V)(C)(1) and (2), Petitioner's right to

21  confrontation was not violated by the testimony of either Manjit Walia or Detective Keller.

22  Petitioner has thus failed to demonstrate that counsel rendered ineffective assistance by failing to

23  preserve his right to confrontation.

24         Fourth, Petitioner has failed to demonstrate that trial counsel's performance was

25  deficient because he did not object when the upper term of nine years for the solicitation of his

26  wife's murder was imposed.  On appeal, Petitioner argued that the sentence violated his Sixth

Amendment right to a jury trial because the trial court relied on facts not submitted to the jury and proven beyond a reasonable doubt as required by *Blakely v. Washington*, 542 U.S. 296 (2004). Subsequent to Petitioner's sentencing, the United States Supreme Court held that California's Determinate Sentencing Law violated a defendant's right to a jury trial to the extent that it allowed a trial court to impose an upper term based on facts found by the court rather than by the jury. *Cunningham v. California*, 549 U.S. 270 (2007). The Ninth Circuit has held that *Cunningham* must be applied retroactively on collateral review. *Butler v. Curry*, 528 F.3d 624, 639 (9th Cir. 2008). In this case, the trial judge sentenced Petitioner to the upper term of nine years based on several aggravating factors, some of which were not submitted to the jury and proven beyond a reasonable doubt. Under California law, however, only one aggravating factor is necessary to set the upper term as the maximum term. *See* CAL. R. CT. 4.420; *People v. Cruz*, 38 Cal.App.4th 427, 433 (1995); *People v. Forster*, 29 Cal.App.4th 1746, 1758 (1994). Here, Petitioner was eligible for the upper term limit because he was "convicted of other crimes for which consecutive sentences could have been imposed but for which concurrent sentences [were] being imposed." (Lodged Doc. 11 at 758.); CAL. R. CT. 4.421(a)(7). Petitioner was thus eligible for the upper term sentence based a fact found true by the jury: that he was guilty of soliciting the murder of Manjit Walia. Accordingly, Petitioner has not established that he was prejudiced as a result of trial counsel's failure to object to the imposition of the upper term sentence.

As discussed above, Petitioner has failed to establish a denial of his constitutional right to effective assistance of counsel as a result of his individual ineffective assistance of counsel claims. He therefore cannot establish that the cumulative effect of trial counsel's alleged errors rendered his assistance constitutionally ineffective. *See Mancuso*, 292 F.3d at 957; *Fuller*, 182 F.3d at 704. Petitioner is not entitled to federal *habeas corpus* relief on this claim.

## VI. CONCLUSION

Accordingly, IT IS RECOMMENDED that Petitioner's petition for writ of *habeas corpus* be denied.

1    These findings and recommendations are submitted to the United States District

2    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-one

3    days after being served with these findings and recommendations, any party may file written

4    objections with the court and serve a copy on all parties.  Such a document should be captioned

5    "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

6    shall be served and filed within seven days after service of the objections.  Failure to file objections

7    within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*,

8    158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).   In any

9    objections he elects to file petitioner may address whether a certificate of appealability should issue

10   in the event he elects to file an appeal from the judgment in this case.  *See* Rule 11, Federal Rules

11   Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability

12   when it enters a final order adverse to the applicant).

13   DATED: December 6, 2010

15

16   CHARLENE H. SORRENTINO
     UNITED STATES MAGISTRATE JUDGE

52